## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA FOR
THE USE OF EURO PAINTING, INC.,
a New Mexico corporation

                Plaintiff,

    v.                                No.

MIRADOR ENTERPRISES, INC., a
Texas corporation; and HUDSON
INSURANCE COMPANY, a Delaware
Corporation,

                Defendants.

## **COMPLAINT**

COMES NOW Use Plaintiff United States of America for the Use of Euro Painting, Inc., by and through counsel, Calvert Menicucci, P.C. (Sean R. Calvert), and for its complaint states as follows:

### JURISDICTION

1.    Euro Painting, Inc. is a corporation organized and existing under the laws of the State of New Mexico having its principal place of business in Albuquerque, New Mexico.

2.    Upon information and belief Hudson Insurance Company ("Hudson") is a Delaware corporation authorized to act as a surety or guarantor of bonds in New Mexico.

3.    Upon information and belief Mirador Enterprises, Inc. is a Texas corporation having its principal place of business in El Paso, Texas.

4.    Jurisdiction is conferred upon this Court by the Miller Act, 40 U.S.C.A. §§ 3131 *et seq.*

5.      Venue for this action properly rests in the District of New Mexico, under the Miller Act, 40 U.S.C.A. § 3133, providing venue in the United States District Court for the District in which the contract was performed.

<u>FACTUAL AVERMENTS</u>

6.      Upon information and belief the United States Air Force awarded indefinite delivery indefinite quantity contract FA9401-14-D-0003 to Mirador Enterprises, Inc. ("Mirador").

7.      Pursuant to the terms of FA9401-14-D-0003 the Air Force could issue multiple task order contracts to Mirador.

8.      Upon information and belief Task Order Contract FA9401-18-F-00A5 was issued to Mirador for construction services to repair the exterior painting on five buildings at Kirtland Air Force Base in the amount of $374,304.50.

9.      Pursuant to 40 U.S.C. § 3131, Mirador, as principal, and Hudson, as surety, executed a payment bond in the full amount of the FA9401-18-F-00A5 Task Order for the prompt payment of all persons supplying labor or materials to be utilized in the prosecution of the work on Kirtland AFB project.

10.      In connection with Mirador's performance of task order FA9401-18-F-00A5, it requested bids to perform painting on the project from multiple painting subcontractors, including Euro Painting.

11.      On July 2, 2018 Euro Painting provided Mirador with a proposal to perform portions of the work on the project in the amount of $90,752.79.

12.      On July 11, 2018 Mirador called Euro Painting and informed them that the bid was too low and that Davis Bacon wages

were required.   Mirador provided the Davis Bacon wage rates for the first time on July 11, 2018.

13.    On July 11, 2018 Euro Painting submitted its revised bid to include the Davis-Bacon wages.  The revised bid was in the amount of $168,913.55.  A copy of Euro Painting's July 11, 2018 revised bid is attached hereto as Exhibit 1.

14.    The Euro Painting proposal identified the various items of work it proposed to perform, including quantities for each item of work.

15.    On August 28, 2018 Mirador entered into a subcontract with Euro Painting that incorporates the same scope of work identified on Euro Painting's proposal, including the quantities of work for each building.   A copy of the Mirador subcontract is attached hereto as Exhibit 2.

16.    Upon information and belief Mirador also received bids from at least one other painting subcontractor.

17.    Following Euro Painting's submission of its proposal for the project and acceptance of the proposal, Mirador required that Euro Painting provide a performance bond as a condition of receiving the subcontract for the work.

## COUNT I

## FRAUDULENT MISREPRESENTATION

18.    Euro Painting incorporates and realleges herein each allegation contained in paragraphs 1 through 17 as set forth above.

19.    On July 2, 2018 and July 11, 2018 Euro Painting submitted its proposals and scope of work, neither of which included any amount for payment or performance bonds.

20.    On August 28, 2018 Mirador entered into the contract with Euro Painting without any requirement for performance or payment bonds.

21.    Subsequent to entry of the subcontract Mirador requested that Euro Painting provide it with a performance bond pursuant to Section 30, which allowed Mirador to request that payment and performance bonds be issued.

22.    Mirador has not modified the subcontract price to reflect the costs of the payment and performance bonds, despite that being additional costs not included in the original proposal or subcontract price.

23.    On or about September 21, 2018 Euro Painting's surety, prior to issuance of the bonds, questioned the spread in prices between Euro Painting and the only other bidder, JTC Coatings, as the difference between Euro Painting's price and JTC Coatings price was $54,695, or an increase of 31% over Euro Painting's price.

24.    On or about September 21, 2018 Mirador responded to Euro Painting's surety stating that they were comfortable that Euro Painting had incorporated the full scope of work, that JTC Coatings may have included additional work, despite the fact that it was bid off the same plans and specifications, and that the bid was within the Air Force's engineer's estimate.

25.    Mirador's statements to Euro Painting's body were false and were known by Mirador to be false or were made by Mirador with reckless disregard as to the truth of the statements.

26.   Mirador intended to deceive Euro Painting and Liberty Mutual through the statements with the intent that Euro Painting and Liberty Mutual rely upon the statements and issue the bonds.

27.   Euro Painting and Liberty Mutual relied upon the statements made by Mirador in executing and providing the bonds.

28.   Euro Painting as a requirement to obtain bonds from Liberty Mutual had entered into a general indemnity agreement with Liberty Mutual and had to grant Liberty Mutual security in the assets of Euro Painting and its principals.

29.   Upon information and belief Mirador knew that the proposal supplied by Euro Painting was low for the work that would be required by the Air Force and requested bonds with the intent that Euro Painting would be terminated and Mirador could then recover the higher costs of completion from Liberty Mutual under the bonds.

30.   Mirador has hired additional subcontractors to supplement Euro Painting's crews and has asserted a claim against Liberty Mutual under the bonds for the additional costs.

31.   Euro Painting has been and will continue to be damaged by Mirador's fraudulent misrepresentations.

32.   Mirador's conduct in failing to disclose its superior knowledge and actively and fraudulent misrepresentations to Euro Painting and Liberty Mutual was willful, wanton, malicious, reckless, oppressive and in bad faith such that punitive damages should be entered against Mirador to defer future misconduct.

## COUNT II

## NEGLIGENT MISREPRESENTATION

33.    Euro Painting incorporates and realleges herein each allegation contained in paragraphs 1 through 32 as set forth above.

34.    Mirador made affirmative and material statements to Euro Painting and Liberty Mutual with the intent that Euro Painting and Liberty Mutual rely upon such statements and to induce Euro Painting and Liberty Mutual to issue bonds for the project.

35.    Mirador's statements were negligently made and were without any reasonable ground for believing that they were true.

36.    Euro Painting and Liberty Mutual relied upon the misrepresentations by Mirador in issuing and executing the bonds.

37.    Euro Painting has been and will continue to be damaged by Mirador's negligent misrepresentations.

## COUNT III

## FRAUDULENT INDUCEMENT

38.    Euro Painting incorporates and realleges herein each allegation contained in paragraphs 1 through 37 as set forth above.

39.    Mirador received bids for the painting scope of work from Euro Painting and from JTC Coatings, Inc.

40.    The difference in price between the proposal from Euro Painting and that from JTC Coatings was $54,695.00 with JTC Coatings proposal being that much higher than the proposal provided by Euro Painting.

41.    Mirador at the time of receiving bids was aware of the engineer's estimate as to probable cost for the painting scope of work

and was aware that the proposal from Euro Painting was substantially below the engineer's estimate.

42.    Mirador failed to provide this information regarding the discrepancies in bidding and likely costs of the work to Euro Painting.

43.    Mirador fraudulently induced Euro Painting into entering into the contract for the performance of the painting work through actively false statements and through withholding information that Mirador knew, or should have known, was necessary to Euro Painting.

44.    Euro Painting was induced into entering into the subcontract with Mirador solely based upon the false statements and failure to provide full and truthful disclosure by Mirador.

45.    Euro Painting has been damaged as a direct and proximate result of Mirador's fraudulent inducement to enter into the subcontract.

## COUNT IV

## **BREACH OF CONTRACT**

46.    Euro Painting incorporates and realleges herein each of the allegations contained in paragraphs 1 through 45 as set forth above.

47.    Euro Painting bid this project based on the Scope of Work identified by the government, including the government specifications.

48.    The Scope of Work issued by the government indicated that the existing surfaces were to be cleaned and repaired and identified in Section 1.2.2 of the Scope of Work the particular methods to be utilized for cleaning and preparing the existing surfaces. Pursuant to the Scope of Work, Euro Painting was to pressure wash existing stucco and CMU surfaces and then prime with Sherwin Williams Loxon and then paint with Sherwin Williams Sherlastic paint.

49.    Upon commencing work on Building B336, the first of the buildings worked on by Euro Painting, Euro Painting was directed by Mirador's supervisors not only to pressure wash the CMU, but to physically remove the sealant between the CMU blocks and in certain instances demolish and reconstruct the CMU walls.

50.    The work which Mirador required Euro Painting to perform was beyond the scope of Euro Painting's contract and was more than was required under the Scope of Work issued by the government.

51.    At a meeting with Mirador on January 21, 2019 Mirador agreed that the work was beyond the scope of the contract and that going forward it would not order Euro Painting and its employees to perform the additional work and that Euro Painting could control its own means and methods of achieving the requirements of the Scope of Work.

52.    Despite agreement that the work that was being required of Euro Painting was beyond the scope of Euro Painting's subcontract Mirador continued to direct Euro Painting and its employees to perform additional work.

53.    Division 9 of the specifications for the project issued by the government required that the coatings not be applied when the temperature was below 10º Celsius, 50º Fahrenheit or over 35º Celsius, 95º Fahrenheit unless specifically pre-approved by the Contracting Officer and the product manufacturer.

54.    Despite the environmental conditions required for Euro Painting to perform its work, Mirador repeatedly required Euro Painting and its crews to appear and commence work prior to declaring that the

work could not be prosecuted as the environmental conditions were not met.

55.     Despite requiring additional labor in connection with the project Mirador has refused to compensate Euro Painting for the additional labor requested.

56.     Upon information and belief the basis for the additional compensation to Mirador above and beyond a reasonable markup for overhead and profit was for the performance of the additional scope of work required by the government beyond the scope of Euro Painting's subcontract.

57.     Notwithstanding being paid to perform the additional work, Mirador has not performed any work in connection with the project, but has required Euro Painting to perform the work on its behalf without compensation.

58.     Mirador's actions and omissions constitute a material and substantial breach of the subcontract with Euro Painting.

59.     Euro Painting has been damaged by Mirador's actions in breach of the subcontract in an amount to be proved at trial.

60.     Mirador's conduct in breaching the subcontract was willful, wanton, malicious, reckless, oppressive, and in bad faith such that punitive damages should be entered against Mirador to defer future misconduct.

## COUNT V
## MILLER ACT

61.     Euro Painting incorporates and realleges herein each of the allegations contained in paragraphs 1 through 60 as set forth above.

62.   Euro Painting has provided labor and materials in furtherance of the government construction project.

63.   Pursuant to its contract with the government and pursuant to the Miller Act, 40 U.S.C.A. §3131, *et seq.*, Mirador was required to provide a payment bond insuring the payment of labor and materials provided by subcontractors and suppliers.

64.   On or about August 6, 2018, Mirador, as principal, and Hudson Insurance Company, as surety, issued a payment bond in the amount of $374,304.50 in connection with the FA9401-14-D-0003 contract.

65.   Euro Painting as a direct subcontractor to Mirador providing labor and materials in connection with the project is a proper claimant and is covered by the terms of the bond and the Miller Act.

66.   Euro Painting having provided labor and materials for which payment has not been received is entitled to the protection of the payment bond.

67.   The failure of Mirador and Hudson Insurance Company to pay Euro Painting for labor and materials furnished constitutes a violation of the Miller Act.

68.   As a direct and proximate result of Mirador and Hudson Insurance Company's violation of the Miller Act, Euro Painting has been damaged in the amount of $70,856.06, plus interest, costs and attorney's fees.

## COUNT VI

## ON PAYMENT BOND

69.   Euro Painting incorporates and realleges herein each of the allegations contained in paragraphs 1 through 68 as set forth above.

70.     The payment bond issued by Hudson Insurance Company is a valid and enforceable contract.

71.     Euro Painting is an intended beneficiary of the payment bond.

72.     Euro Painting is entitled to payment of its claims against the payment bond pursuant to the terms of the bond.

73.     Hudson Insurance Company's refusal to pay Euro Painting for labor and materials furnished in connection with the project constitutes a material breach of the payment bond.

74.     As a direct and proximate result of Mirador and Hudson Insurance Company's breach of the payment bond, Euro Painting has been damaged in the amount of $70,856.06, plus interest, costs and attorney's fees.

WHEREFORE, Euro Painting, Inc. respectfully requests judgment against Mirador Enterprises, Inc. and Hudson Insurance Company as follows:

A.      As to Count I a judgment against Mirador Enterprises, Inc. in an amount to be proved at trial, including punitive damages;

B.      As to Count II a judgment against Mirador Enterprises, Inc. in an amount to be proved at trial;

C.      As to Count III a judgment against Mirador Enterprises in an amount to be proved at trial, including punitive damages;

D.      As to Count IV a judgment against Mirador Enterprises in an amount to be proved at trial, including punitive damages;

E.      As to Count V a judgment against Mirador Enterprises, Inc. and Hudson Insurance Company, jointly and severally, in the amount of $70,856.06;

F.    As to Count VI a judgment against Mirador Enterprises, Inc. and Hudson Insurance Company, jointly and severally, in the amount of $70,856.06; and

G.    As to all account for an award of pre- and post-judgment interest, costs and reasonable attorney fees.

Respectfully submitted,

Calvert Menicucci, P.C.

Sean R. Calvert
Counsel for Plaintiff
8900 Washington St., NE, Suite A
Albuquerque, New Mexico 87113
(505) 247-9100
scalvert@hardhatlaw.net


www.europaintinginc.com

**Euro Painting, Inc.**

Tel: 505.294.EURO (3876)
Fax: 505.274.7215
www.europaintinginc.com

| Client: | Mirador Enterprises, Inc. - KAFB | Home: | (915) 229-0055 |
| Property: | 2000 Wyoming Blvd SE | | |
| | Albuquerque, NM 87123 | | |

| Operator: | BART |

| Estimator: | Bart Stobienia | Cellular: | (505) 440-3475 |
| Position: | Estimator | E-mail: | bart@europaintinginc.com |
| Company: | Euro Painting, Inc. | | |

| Date Entered: | 7/1/2018 9:48 AM | Date Job Contracted: |
| Date Job Began: | | Date Job Completed: |

| Price List: | NMAL7R_JUN18 |
| Labor Efficiency: | Remodel |
| Estimate: | 2018-07-11-1124 |

Proposal and Acceptance:
This document contains confidential information from Euro Painting, Inc. which may also be legally privileged. The information is intended solely for the use by the individual or entity named as the recipient hereof. Be aware any disclosure, copying, distribution or use of the contents of this transmission is prohibited. We propose hereby to furnish material and labor complete in accordance with this proposal. All material is guaranteed to be as specified. All work to be completed in a workmanlike manner according to standard practices. Any alteration or deviation from this proposal specifications involving extra cost will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents or delays beyond our control. Our workers are fully covered by workmens compensation insurance. Euro Painting, Inc. offers a one-year labor warranty on all work performed by the company. New Mexico license number 89413.
This proposal may be withdrawn by us if not accepted within 90 days from the date entered.
Payment: Schedule will be established at the acceptance of the proposal, signature on certificate of completion required. If legal proceedings are commenced to resolved a dispute arising out of, or
relating to, this agreement, the prevailing party shall be entitled to recover all costs, legal fees and expert witness fees as sell as any costs or legal fees in connection with any appeals.
By signing this contract I hereby give Euro Painting, Inc. permission to publish the photographs taken of the painting project described in said estimate. All images may be included within or utilized as illustrations, advertisements or publications, either in printed form or in digital format. I hereby certify and covenant that I am authorized to make such an agreement.
Acceptance of Proposal
This estimate prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payment will be made according to terms. Late payments are subject to 1.5% interest per month plus costs and attorney fees.
Date of acceptance:          Signature:          Print name:

EXHIBIT "1"



**Euro Painting, Inc.**

Tel: 505.294.EURO (3876)
Fax: 505.274.7215
www.europaintinginc.com

**2018-07-11-1124**

### B336 Engine Shop

| DESCRIPTION | QNTY |
| --- | --- |
| 1. Clean with pressure/chemical spray | 18,000.00 SF |
| 2. Mask and prep for paint - paper and tape (per LF) | 1,600.00 LF |
| 3. Two coat stucco over masonry (repairs) | 1,000.00 SF |
| 4. Paint stucco with SHERLASTIC® Elastomeric Masonry Coating | 18,000.00 SF |
| 5. Prime where needed & paint garage door - 2 coats with Sherwin Williams Pro-cryl | 10.00 EA |
| 6. Prime where needed & paint door slab only - 2 coats with Sherwin Williams A100 | 6.00 EA |
| 7. Prime where needed & paint door  jamb - 2 coats with Sherwin Williams A100 | 6.00 EA |
| 8. Prime where needed & paint - Security Post - metal with Sherwin Williams Pro-cryl | 16.00 EA |
| 9. Prime where needed & paint exterior fascia - metal, 6"- 8" wide with Sherwin Williams Pro-cryl | 804.00 LF |
| 10. Prime where needed & paint metal stairs, pipes and vents with Sherwin Williams Pro-cryl | 500.00 SF |
| 11. Prime where needed & paint gazebo with Sherwin Williams A100 | 450.00 SF |
| 12. Final cleaning - construction - Commercial | 2,500.00 SF |

### B497 AFRL Directed Weapons Directorate

| DESCRIPTION | QNTY |
| --- | --- |
| 13. Clean with pressure/chemical spray | 18,000.00 SF |
| 14. Mask and prep for paint - paper and tape (per LF) | 2,400.00 LF |
| 15. Two coat stucco over masonry (repairs) | 1,000.00 SF |
| 16. Paint stucco (includes the sign) with SHERLASTIC® Elastomeric Masonry Coating | 18,000.00 SF |
| 17. Drywall tape joint/repair - per LF | 40.00 LF |
| 18. Entry ceilling - paint two coats with Sherwin Williams A100 | 248.60 SF |
| 19. Prime where needed & paint ext. railing with Sherwin Williams Pro-cryl | 262.00 LF |
| 20. Prime where needed & paint metal stairs and gates with Sherwin Williams Pro-cryl | 690.00 SF |
| 21. Prime where needed & paint roof vent | 9.00 EA |
| 22. Prime where needed & paint - Security Post - metal with Sherwin Williams Pro-cryl | 6.00 EA |
| 23. Prime where needed & paint door slab only - 2 coats with Sherwin Williams A100 | 7.00 EA |
| 24. Prime where needed & paint door  jamb - 2 coats with Sherwin Williams A100 | 6.00 EA |
| 25. Prime where needed & paint exterior fascia - metal, 6"- 8" wide with Sherwin Williams Pro-cryl | 120.00 LF |
| 26. Primel & paint Glazed tile with Sherwin Williams A100 | 120.00 LF |
| 27. Final cleaning - construction - Commercial | 2,500.00 SF |

### B499 AFRL Directed Weapons Directorate

| DESCRIPTION | QNTY |
| --- | --- |
| 28. Clean with pressure/chemical spray | 15,000.00 SF |
| 29. Mask and prep for paint - paper and tape (per LF) | 2,400.00 LF |
| 30. Two coat stucco over masonry (repairs) | 500.00 SF |



**Euro Painting, Inc.**

Tel: 505.294.EURO (3876)
Fax: 505.274.7215
www.europaintinginc.com

### CONTINUED - B499 AFRL Directed Weapons Directorate

| DESCRIPTION | QNTY |
|---|---|
| 31. Paint stucco with SHERLASTIC® Elastomeric Masonry Coating | 15,000.00 SF |
| 32. Prime where needed & paint ext. railing with Sherwin Williams Pro-cryl | 67.00 LF |
| 33. Prime where needed & paint metal lamp posts and gates with Sherwin Williams Pro-cryl | 340.00 SF |
| 34. Prime where needed & paint roof vent | 9.00 EA |
| 35. Prime where needed & paint door slab only - 2 coats with Sherwin Williams A100 | 6.00 EA |
| 36. Prime where needed & paint door jamb - 2 coats with Sherwin Williams A100 | 6.00 EA |
| 37. Prime where needed & paint exterior fascia - metal, 6"- 8" wide with Sherwin Williams Pro-cryl | 856.00 LF |
| 38. Prime & paint Glazed tile with Sherwin Williams A100 | 856.00 LF |
| 39. Sand wood - Gazebo | 250.00 SF |
| 40. Stain/finish rail - Gazebo | 40.00 LF |
| 41. Stain fascia - wood, 6"- 8" wide - Gazebo | 60.00 LF |
| 42. Stain ceiling- exposed rafters - Gazebo | 225.00 SF |
| 43. Prime where needed & paint wood siding - Storage Bld with Sherwin Williams A100 | 700.00 SF |
| 44. Prime where needed & paint exterior fascia - wood, 4"- 6" wide - Storage Bld with Sherwin Williams A100 | 40.00 LF |
| 45. Prime where needed & paint exterior soffit - wood - Storage Bld with Sherwin Williams A100 | 20.00 SF |
| 46. Final cleaning - construction - Commercial | 3,000.00 SF |

### B20170 Outdoor Recreation

| DESCRIPTION | QNTY |
|---|---|
| 47. Clean with pressure/chemical spray | 23,000.00 SF |
| 48. Mask and prep for paint - paper and tape (per LF) | 4,050.00 LF |
| 49. Two coat stucco over masonry (repairs) | 1,000.00 SF |
| 50. Paint stucco with SHERLASTIC® Elastomeric Masonry Coating | 23,000.00 SF |
| 51. Prime where needed & paint ext. railing with Sherwin Williams Pro-cryl | 40.00 LF |
| 52. Prime where needed & paint metal A/C Unit support platform with Sherwin Williams Pro-cryl | 100.00 SF |
| 53. Prime where needed & paint door slab only - 2 coats with Sherwin Williams A100 | 17.00 EA |
| 54. Prime where needed & paint door jamb - 2 coats with Sherwin Williams A100 | 12.00 EA |
| 55. Prime where needed & paint exterior fascia - metal, 6"- 8" wide with Sherwin Williams Pro-cryl | 1,350.00 LF |
| 56. Final cleaning - construction - Commercial | 3,000.00 SF |

### B20216 Old Post Office

| DESCRIPTION | QNTY |
|---|---|
| 57. Clean with pressure/chemical spray | 4,200.00 SF |
| 58. Mask and prep for paint - paper and tape (per LF) | 700.00 LF |
| 59. Two coat stucco over masonry (repairs) | 350.00 SF |
| 60. Paint stucco with SHERLASTIC® Elastomeric Masonry Coating | 4,200.00 SF |
| 61. Prime where needed & paint ext. railing with Sherwin Williams Pro-cryl | 153.00 LF |



**Euro Painting, Inc.**

Tel: 505.294.EURO (3876)
Fax: 505.274.7215
www.europaintinginc.com

### CONTINUED - B20216 Old Post Office

| DESCRIPTION | QNTY |
|---|---|
| 62.  Prime where needed & paint door slab only - 2 coats with Sherwin Williams A100 | 7.00 EA |
| 63.  Prime where needed & paint door  jamb - 2 coats with Sherwin Williams A100 | 7.00 EA |
| 64.  Final cleaning - construction - Commercial | 1,500.00 SF |

**Boom Lift**

| DESCRIPTION | QNTY |
|---|---|
| 67.  Boom lift - 30'-45' reach | 3.00 MO |



**Euro Painting, Inc.**

Tel: 505.294.EURO (3876)
Fax: 505.274.7215
www.europaintinginc.com

## Recap by Room

**Estimate: 2018-07-11-1124**

| | | |
|---|---|---|
| **B336 Engine Shop** | 37,371.56 | 22.12% |
| **B497 AFRL Directed Weapons Directorate** | 37,683.65 | 22.31% |
| **B499 AFRL Directed Weapons Directorate** | 32,768.01 | 19.40% |
| **B20170 Outdoor Recreation** | 45,119.43 | 26.71% |
| **B20216 Old Post Office** | 9,970.90 | 5.90% |
| **Boom Lift** | 6,000.00 | 3.55% |
| **Subtotal of Areas** | 168,913.55 | 100.00% |
| **Total** | 168,913.55 | 100.00% |



**Euro Painting, Inc.**

Tel: 505.294.EURO (3876)
Fax: 505.274.7215
www.europaintinginc.com

## Recap by Category

| Items | Total | % |
|---|---|---|
| CLEANING | 34,405.00 | 20.37% |
| DRYWALL | 186.80 | 0.11% |
| HEAVY EQUIPMENT | 6,000.00 | 3.55% |
| PAINTING | 113,152.75 | 66.99% |
| STUCCO & EXTERIOR PLASTER | 15,169.00 | 8.98% |
| Subtotal | 168,913.55 | 100.00% |

Bart Stobienia
Estimator

**Labor-Breakdown**

| Code | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| CLN | Cleaning Technician | 55.00 | 540.24 | 29,713.00 |
| DRY | Drywall Installer/Finisher | 55.00 | 3.18 | 174.80 |
| PNT | Painter | 55.00 | 1,637.98 | 90,088.92 |
| STU | Stucco Installer | 55.00 | 224.70 | 12,358.50 |
| Total | | | 2,406.10 | 132,335.22 |

Thank you for considering us for your next painting project.



## Sub-Contract Agreement
With Monthly Progress Payments

THIS AGREEMENT, made and entered into this **28th** day of **August 2018**, by and between **Euro Painting, Inc.**, with principal office **1659 Eubank Blvd NE, Ste. B, Albuquerque, NM 87112** hereinafter called the Sub-Contractor and **MIRADOR Enterprises, Inc.** hereinafter called the Contractor. The Sub-Contractor and Contractor in consideration of the terms, covenants, and conditions herein contained hereby agree as follows, subject to the approval of the Owner:

Subcontractor will provide all the supervision, labor, material, equipment and tools to accomplish the complete Statement of Work:

### B336 Engine Shop
- Clean with pressure/chemical spray 18,000.00 SF
- Mask and prep for paint - paper and tape (per LF) 1,600.00 LF
- Two coat stucco over masonry (repairs) 1,000.00 SF
- Paint stucco with SHERLASTIC® Elastomeric Masonry Coating 18,000.00 SF
- Prime where needed & paint garage door - 2 coats with Sherwin Williams Pro-cryl 10.00 EA
- Prime where needed & paint door slab only - 2 coats with Sherwin Williams A100 6.00 EA
- Prime where needed & paint door jamb - 2 coats with Sherwin Williams A100 6.00 EA
- Prime where needed & paint - Security Post - metal with Sherwin Williams Pro-cryl 16.00 EA
- Prime where needed & paint exterior fascia - metal, 6"- 8" wide with Sherwin Williams Pro-cryl 804.00 LF
- Prime where needed & paint metal stairs, pipes and vents with Sherwin Williams Pro-cryl 500.00 SF
- Prime where needed & paint gazebo with Sherwin Williams A100 450.00 SF
- Final cleaning - construction - Commercial 2,500.00 SF

### B497 AFRL Directed Weapons Directorate
- Clean with pressure/chemical spray 18,000.00 SF
- 14. Mask and prep for paint - paper and tape (per LF) 2,400.00 LF
- 15. Two coat stucco over masonry (repairs) 1,000.00 SF
- 16. Paint stucco (includes the sign) with SHERLASTIC® Elastomeric Masonry Coating 18,000.00 SF
- 17. Drywall tape joint/repair - per LF 40.00 LF
- 18. Entry ceiling - paint two coats with Sherwin Williams A100 248.60 SF
- 19. Prime where needed & paint ext. railing with Sherwin Williams Pro-cryl 262.00 LF
- 20. Prime where needed & paint metal stairs and gates with Sherwin Williams Pro-cryl 690.00 SF
- 21. Prime where needed & paint roof vent 9.00 EA
- 22. Prime where needed & paint - Security Post - metal with Sherwin Williams Pro-cryl 6.00 EA
- 23. Prime where needed & paint door slab only - 2 coats with Sherwin Williams A100 7.00 EA
- 24. Prime where needed & paint door jamb - 2 coats with Sherwin Williams A100 6.00 EA
- 25. Prime where needed & paint exterior fascia - metal, 6"- 8" wide with Sherwin Williams Pro-cryl 120.00 LF
- 26. Prime & paint Glazed tile with Sherwin Williams A100 120.00 LF
- 27. Final cleaning - construction - Commercial 2,500.00 SF

### B499 AFRL Directed Weapons Directorate
- Clean with pressure/chemical spray 15,000.00 SF
- Mask and prep for paint - paper and tape (per LF) 2,400.00 LF
- Two coat stucco over masonry (repairs) 500.00 SF
- Paint stucco with SHERLASTIC® Elastomeric Masonry Coating 15,000.00 SF
- Prime where needed & paint ext. railing with Sherwin Williams Pro-cryl 67.00 LF
- Prime where needed & paint metal lamp posts and gates with Sherwin Williams Pro-cryl 340.00 SF
- Prime where needed & paint roof vent 9.00 EA
- Prime where needed & paint door slab only - 2 coats with Sherwin Williams A100 6.00 EA
- Prime where needed & paint door jamb - 2 coats with Sherwin Williams A100 6.00 EA

Sub-Contract Agreement No. 082818-KAFB-REP
Page 1

Sub-Contractor Initials ___

Contractor Initials ___

EXHIBIT "2"



- Prime where needed & paint exterior fascia - metal, 6"- 8" wide with Sherwin Williams Pro-cryl 856.00 LF
- Prime & paint Glazed tile with Sherwin Williams A100 856.00 LF
- Sand wood - Gazebo 250.00 SF
- Stain/finish rail - Gazebo 40.00 LF
- Stain fascia - wood, 6"- 8" wide - Gazebo 60.00 LF
- Stain ceiling- exposed rafters - Gazebo 225.00 SF
- Prime where needed & paint wood siding - Storage Bldg. with Sherwin Williams A100 700.00 SF
- Prime where needed & paint exterior fascia - wood, 4"- 6" wide - Storage Bldg. with Sherwin Williams 40.00 LF A100
- Prime where needed & paint exterior soffit - wood - Storage Bldg. with Sherwin Williams A100 20.00 SF
- Final cleaning - construction - Commercial 3,000.00 SF

**B20170 Outdoor Recreation**
- Clean with pressure/chemical spray 23,000.00 SF
- Mask and prep for paint - paper and tape (per LF) 4,050.00 LF
- Two coat stucco over masonry (repairs) 1,000.00 SF
- Paint stucco with SHERLASTIC® Elastomeric Masonry Coating 23,000.00 SF
- Prime where needed & paint ext. railing with Sherwin Williams Pro-cryl 40.00 LF
- Prime where needed & paint metal A/C Unit support platform with Sherwin Williams Pro-cryl 100.00 SF
- Prime where needed & paint door slab only - 2 coats with Sherwin Williams A100 17.00 EA
- Prime where needed & paint door jamb - 2 coats with Sherwin Williams A100 12.00 EA
- Prime where needed & paint exterior fascia - metal, 6"- 8" wide with Sherwin Williams Pro-cryl 1,350.00 LF
- Final cleaning - construction - Commercial 3,000.00 SF

**B20216 Old Post Office**
- Clean with pressure/chemical spray 4,200.00 SF
- Mask and prep for paint - paper and tape (per LF) 700.00 LF
- Two coat stucco over masonry (repairs) 350.00 SF
- Paint stucco with SHERLASTIC® Elastomeric Masonry Coating 4,200.00 SF
- Prime where needed & paint ext. railing with Sherwin Williams Pro-cryl 153.00 LF
- Prime where needed & paint door slab only - 2 coats with Sherwin Williams A100 7.00 EA
- Prime where needed & paint door jamb - 2 coats with Sherwin Williams A100 7.00 EA
- Final cleaning - construction - Commercial 1,500.00 SF

**Kirtland Air Force Base,** in strict accordance with the requirements, specifications and plans of the U.S. Air Force at Kirtland Air Force Base, NM, under Contract Number **FA9401-14-D-0003-FA940118F00A5 Repair Exterior Painting (5 Buildings).**

> **Notice to proceed:**  <u>Coordinate with Project Manager</u>
> **Period of performance:**  <u>150 days</u>

Section 1. The Subcontract also requires the scope of work, to include but not limited to, providing certificates of insurance for general liability, auto liability and worker's compensation in compliance to the contract, W-9 Identification Number and Certification, Statement and Acknowledgement Standard form 1413, adhering to demolition notifications, adhering to timely submittals requirements, adhering to the Contractor's Quality Control and Safety Plan, providing schedule of values, safety equipment, attending project meetings, safety meetings, inspecting their own work, providing daily clean-up and daily reports, contract reports, certified payrolls adhering to wage determinations, adhering to environmental requirements, warranties, close-out documents, coordinating work and schedule with other subcontractors and all other special project procedures required by U.S. Air Force under this contract.

Section 2. Subcontractor is required to comply in strict accordance with U.S. Department of Justice Immigration and Naturalization Employment Eligibility Verification requirements.  The Subcontractor is required to request all and any employee and lower tier subcontractors to comply with Naturalization Employment Eligibility Verification requirements.

Section 3. The Sub-Contractor expressly covenants and agrees to keep himself thoroughly informed as to the progress of the job, to begin work within the Notice To Proceed Requirement provided by Contractor, to prosecute the work continuously and uninterruptedly with all possible speed, and to complete the entire work covered by this Sub-Contract at such time as not to interfere with or delay performance of the General Contract or of the work of any other sub-contractor. The Sub-Contractor further agrees that the

Sub-Contract Agreement No. 082818-KAFB-REP
Page 2

Sub-Contractor Initials _____
Contractor Initials _____



work covered by this Sub-Contract will be done in accordance with the construction schedule established by the Contractor. The Sub-Contractor further agrees to furnish and maintain in first class operating condition a sufficient amount of personnel, equipment, machinery, tools, implements and supplies, and to furnish all material and all labor, including superintendents, overhead and field accounting, and all things whatsoever required or convenient to properly carry out and perform the work herein specified, and to perform all work required by this Sub-Contract strictly in accordance with the General Contract, a copy of which is on file in the office of the Contractor and is available for inspection at all times.

This Sub-Contract contemplates a complete installation covering the work described hereinbefore and shall be all-inclusive under common usage in the industry and/or as may reasonably be inferred by the contract plans and specifications. Because these plans, drawing, specifications and addenda thereto are an essential element of this Sub-Contract, the Sub-Contractor's failure to thoroughly check and verify the scope and extent of them shall not act to modify or mitigate the complete responsibility herein contemplated as to the work to be performed.

In the event the Sub-Contractor fails to carry on such work at such rates of progress as are specified under the terms hereof, the Contractor may, at it's option, require the Sub-Contractor to increase the number of men and/or the amount of the equipment employed in the performance of said work to such extent as the Contractor may deem necessary or desirable, or the Contractor may exercise any other right or remedy it may have, including, but not limited to, the termination of the Sub-Contract and the enforcement of the provisions in other sections of this Sub-Contract.

Section 4.  IN CONSIDERATION WHEREOF, the Contractor agrees to pay the Sub-Contractor for the full and faithful performance of his work, the sum of  **One Hundred Seventy Three Thousand Nine Hundred Eighty Dollars and 96/100 ($173,980.96)** , in current funds, subject to additions and deductions for changes as may be agreed upon in writing signed by both parties, provided that no payments are to be made unless the Sub-Contractor's rate of progress, work done and material and/or services furnished are satisfactory to the Contractor and as herein agreed upon. **This subcontract allows for monthly progress payments.** The following monthly progress payment process must be adhered to under this subcontract. Once a month, (on or about the 25th of each month) the Contractor's (MIRADOR's) Project Manager will review the Subcontractor's monthly per cent of work completed and mutually agree to a monthly per cent of work completed. The Contractor's (MIRADOR's) Project Manager will present the mutually agreed to monthly per cent of work completed to the Owner for approval. The mutually agreed to monthly per cent of work completed may be subject to change by the Owner. Once the Contractor's (MIRADOR's) Project Manager receives an approved monthly per cent of work completed from the Owner, the Subcontractor may invoice for the approved monthly per cent of work completed. The Contractor (MIRADOR) will make monthly progress payments to the Subcontractor within 5 working days after receipt of payment from the Owner. Payments will consist of as follows: **The balance due upon the work being completed and accepted by the Owner less retainage percent required by the Owner (if applicable)** of all labor and material which has been placed in position and for which the Owner allows, accepts and has paid the Contractor. If the Owner has withheld retainage, the Contractor (MIRADOR) will make payment to the Subcontractor within five (5) working days after receipt of the retainage payment from the Owner.

Section 5.  The term "General Contract" as used in this Sub-Contract, shall be deemed to mean the contract between the Contractor and the Owner, together with all the provisions, general conditions, plans, drawings, specifications, and addenda which are made a part thereof or referred to therein, and with all of which the Sub-Contractor acknowledges he is familiar, as well as any additions thereto and modifications thereof subsequently made.

Section 6.  Insofar as the provisions of the General Contract do not conflict with specified provisions herein contained, they, and each of them, are hereby incorporated into this Sub-Contract as fully as if completely written herein. The Sub-Contractor agrees to be bound to the Contractor by all the terms of the General Contract applicable to this Sub-Contract, and to assume toward Contractor with respect to the work and all operations of Sub-Contractor on this construction project all the obligations and responsibilities that Contractor by the General Contract assumes toward Owner. The Sub-Contractor agrees that it will so perform this Sub-Contract as not to violate any terms, covenants or conditions of the General Contract. The relationship of the Sub-Contractor hereunder toward Contractor shall be the same as that of Contractor toward the Owner under the General Contract, and the relationship of the Contractor hereunder to the Sub-Contractor shall be the same as that of the Owner toward the Contractor under the General Contract.

Section 7.  The Sub-Contractor shall submit to the Contractor's office, upon completion of the requisition for payment, in duplicate, covering the value of the work completed to the satisfaction of the Owner during that month.

Particular attention is directed to the General Contract regulations and requirements concerning certified payroll submittals and reports and requisitions for payment. Sub-Contractor agrees to provide adequate and satisfactory facilities for such requirements and regulations and to comply meticulously with them. If monies due the General Contractor for partial payments or final payments are withheld or delayed because any payroll of the Sub-Contractor or its sub-contractors is found deficient, wanting or lacking by the Owner or its representative, or the contracting officer, Sub-Contractor hereby agrees to be assessed by Contractor a sum equal to six per cent (6%) per annum of the partial or final amount for the period such payment is delayed. The period of assessment will be considered to be from the due date of partial or final payment to the date the objection is cleared. Nothing herein, however, is to be construed as modifying the other provisions of this Sub-Contract or as altering or changing the rights and remedies of Contractor as may be elsewhere contained herein, and in no event shall Contractor be obligated to pay Sub-Contractor for any work performed or materials furnished until the Owner allows, accepts and pays Contractor for such work performed or materials furnished.

Section 8.  The Sub-Contractor shall furnish the Contractor with such partial releases and waivers of lien from his materialmen and creditors as the Contractor may request from time to time on labor and/or material and/or other claims, and final releases and waivers of lien at the time of final payment of this Sub-Contract.

Section 9.  The Sub-Contractor shall furnish, if requested by the Contractor, sworn affidavits from time to time, in accordance with the form provided by the Contractor, which shall state amounts due or to become due, amounts paid, and any other information clearly to indicate the financial condition of the Sub-Contractor, insofar as it relates to labor and material furnished and to be furnished, under this Sub-Contract and, the Sub-Contractor agrees to pay as they accrue, and to protect, indemnify and hold the Contractor harmless against, and all liens and claims of persons claiming to have performed labor or to have furnished material, appliances, insurance or services in connection therewith, regardless of when such liens or claims may arise. If at any time there shall be any lien or claim against the Sub-Contractor and/or Contractor for labor, materials, appliances, insurance or services used in said work for which, if established, the Contractor is of the opinion it might be directly or indirectly liable, then the Contractor may retain out of any money due or to become due the Sub-Contractor an amount sufficient to indemnify the Contractor again liability or loss by reason of such lien or claim, including the reasonable costs of any litigation there under, until the same shall be effectively satisfied, discharged or cancelled; or the Contractor may take such other steps as it may deem necessary to protect itself against any claims.

Section 10.  The terms of payment provided herein shall not make it incumbent on the Contractor to make payments in an amount that would not leave a sufficient balance to cover the retained percentage, together with an amount sufficient to satisfy all obligations of the Sub-Contractor for labor, materials, etc., furnished or to be furnished by it under this Sub-Contract.

Section 11.  The Sub-Contractor agrees that monies received for the performance of this contract shall be used primarily for labor and materials entering into this work and said monies shall not be diverted to satisfy obligations of the Sub-Contractor on other contracts.

Section 12.  The Sub-Contractor agrees to indemnify and save harmless the Owner and Contractor against all costs or claims for transportation, freight and express, on men, materials and equipment to an/or from the job, and for all other incidental expenses in connection with his work, and to prepay the transportation charges on all materials, etc., shipped.

Section 13.  The Sub-Contractor agrees to pay not less than the scale of wages prescribed in the General Contract or not less that the scale prescribed by law in case the General Contract provides no such scale. If the Sub-Contractor shall fail in any respect to comply with the covenants in the preceding sentence, the Contractor shall have the

**Sub-Contract Agreement No. 082818-KAFB-REP**
**Page 3**

Sub-Contractor Initials

Contractor Initials



option to cancel this Sub-Contract forthwith, in addition to exercising any or all other rights given Contractor hereunder in the event of a breach hereof. All penalties stated in the General Contract shall be applicable hereunder as between the Sub-Contractor and the Contractor except as otherwise expressly provided herein.

In the prosecution of all work covered by the Sub-Contract, or on this construction project, Sub-Contractor agrees to recognize and comply with all agreements of the General Contractor with local building trade councils and/or separate unions concerning labor and working conditions and other matters applicable to this work, insofar as these agreements do not conflict with or violate any local, state or federal laws or properly constituted orders or regulations.

Section 14.  Contractor may, at any time, be written order and without notice to the sureties, require changed in, deviations from, additions to, and omissions from, the work herein contracted, and Sub-Contractor shall proceed with the work as so directed.  If such changes, additions or omissions cause an increase or decrease in the Sub-Contract price or in the time required for performance, an equitable adjustment shall be made and the Sub-Contract shall be modified in writing accordingly, but nothing herein contained shall excuse the Sub-Contractor from proceeding with the prosecution of the work as changed.  Before proceeding with any change, deviation, addition or omission the Sub-Contractor will first obtain written authorization from the Contractor.  The Sub-Contractor shall have no dealings with the Owner or his authorized representatives in regard to changes, additions or omissions in connection with this work, but must deal only with the Contractor.

Section 15.  Prior to commencement of Work, Subcontractors and all of their lower-tier subcontractors shall furnish an original of a current, job-specific insurance certificate directed to **Mirador Enterprises**.  **Subcontractor** shall maintain, during the entire period of its performance under this Agreement, for both the **Sub-Contractor** and its employees, the following minimum insurance requirements.  The **Subcontractor** shall purchase and maintain insurance of the following types of coverage and limits of liability:

        **Commercial General Liability**:
        $2,000,000 Products/Completed Operations Aggregate
        $2,000,000 General Aggregate
        $1,000,000 Any One Occurrence (Coverage A)
        $1,000,000 Any One Person or Organization (Coverage B)
        **Automobile Liability (Comprehensive Coverage)**
        $1,000,000 Each Accident
        **Employers Liability (Coverage "B" on the Workers Compensation Policy)**
        $1,000,000 Each Accident
        $1,000,000 Each Employee for Injury by Disease
        **Umbrella Liability**
        $2,000,000 Each Occurrence

**Sub-Contractor** shall include Contractor and the Owner as an additional insured on its General Liability, Commercial Automobile, and Commercial Excess ("Umbrella") policies per ISO for CG2010 (11-85) or its equivalent.
**Sub-Contractor** shall provide a waiver of subrogation on all policies ad a 30-day notice of cancellations
**Sub-Contractor's** coverage shall be primary to all other coverages

HOLD HARMLESS:
TO THE FULLEST EXTENT PERMITTED BY LAW, SUB-CONTRACTOR WILL INDEMNIFY AND HOLD HARMLESS MIRADOR ENTERPRISES, INC. AND OWNER, THEIR OFFICERS, DIRECTORS, PARTNERS, REPRESENTATIVES, AGENTS AND EMPLOYEES FROM AND AGAINST ANY AND ALL CLAIMS, SUITS, LIENS, JUDGMENTS, DAMAGES, LOSSES AND EXPENSES, INCLUDING LEGAL FEES AND ALL COURT COSTS AND LIABILITY (INCLUDING STATUTORY LIABILITY) ARISING IN WHOLE OR IN PART AND IN ANY MANNER FROM INJURY AND/OR DEATH OF PERSON OR DAMAGE TO OR LOSS OF ANY PROPERTY RESULTING FROM THE ACTS, OMISSIONS, BREACH OR DEFAULT OF SUBCONTRACTOR, ITS OFFICERS, DIRECTORS, AGENTS, EMPLOYEES AND SUBCONTRACTORS, IN CONNECTION WITH THE PERFORMANCE OF ANY WORK BY OR FOR SUBCONTRACTOR PURSUANT TO ANY CONTRACT PURCHASE ORDER AND/OR RELATED PROCEED ORDER, EXCEPT THESE CLAIMS, SUITS, LIENS, JUDGMENTS, DAMAGES, LOSSES AND EXPENSES CAUSED BY THE NEGLIGENCE OF MIRADOR ENTERPRISES, INC. SUBCONTRACTOR WILL DEFEND AND BEAR ALL COSTS OF DEFENDING ANY ACTIONS OR PROCEEDINGS BROUGHT AGAINST MIRADOR ENTERPRISES, INC. AND/OR OWNER, THEIR OFFICERS, DIRECTORS, AGENTS AND EMPLOYEES, ARISING IN WHOLE OR IN PART OUT OF ANY SUCH ACTS, OMISSION, BREACH OR DEFAULT. THE FOREGOING INDEMNITY SHALL INCLUDE INJURY OR DEATH OF ANY EMPLOYEE OF THE CONTRACTOR OR SUBCONTRACTOR AND SHALL NOT BE LIMITED IN ANY WAY BY AN AMOUNT OR TYPE OF DAMAGE, COMPENSATION, OR BENEFITS PAYABLE UNDER ANY APPLICABLE WORKERS COMPENSATION, DISABILITY BENEFITS OR OTHER SIMILAR EMPLOYEES BENEFIT ACT.
THE SUB-CONTRACTOR HEREBY EXPRESSLY PERMITS THE GENERAL CONTRACTOR TO PURSUE AND ASSERT CLAIMS AGAINST THE SUB-CONTRACTOR FOR INDEMNITY, CONTRIBUTION AND COMMON LAW NEGLIGENCE ARISING OUT OF CLAIMS FOR DAMAGES FOR DEATH AND PERSONAL INJURY

Section 16.  The Sub-Contractor agrees to and does hereby accept full and exclusive liability for the payment of any and all contributions or taxes for Unemployment Insurance and/or Old Age Retirement Benefit, Pensions or Annuities, now or hereafter imposed by the Government of the United States, and/or by the Government of any state or territory of the United States, which are measured by the wages, salaries or other remuneration paid to persons employed by the Sub-Contractor on work performed under the terms of this Sub-Contract.

The Sub-Contractor further agrees to obtain and pay for necessary licenses, fees, and permits as required for its work.  Should pre-registration be required, the Sub-Contract hereby warrants that it has complied with such prerequisite.

Sub-Contractor also agrees to pay, and hereby accepts full and exclusive liability for the payment of all sales or use taxes, or taxes measured by receipts, if any, in connection with the work under this Sub-Contract.

Section 17.  The Sub-Contractor shall route all equipment and materials to be used in the execution of this contract as designated by the Contractor, providing the transportation costs are not increased by so doing.  It is expressly agreed that the carrier so designated shall be the agent of the Sub-Contractor and not the agent of the Contractor.

Section 18.  Sub-Contractor agrees not to remove guards or safety appliances, except on authority of Contractor's Superintendent, and to replace such guards and appliance promptly.  Failure to make such replacement will authorize Contractor to do such work and charge the costs thereof to Sub-Contractor, Sub-Contractor also agrees to abide by all safety rules, practices and programs as established by the General Contract, Owner or General Contractor, including, but not restricted to, any Safety Programs which are attached hereto.

Section 19.  This Sub-Contract takes precedence over any and all proposals, correspondence and oral agreements made prior to the date hereof, and includes all changes, addenda, etc., to date.

**Sub-Contract Agreement No. 082818-KAFB-REP**
**Page 4**

        **Sub-Contractor Initials** _____

        **Contractor Initials** _____



Section 20.  The Sub-Contractor shall not assign or sub-contract this Contract or any part thereof or any interest therein without first obtaining the written consent of the Contractor.

Section 21.  Sub-Contractor may not assign or attempt to assign any funds accrued or to accrue under this contract without first obtaining the written consent of Contractor and no such assignment shall be binding on Contractor unless and until accepted in writing by Contractor.

Section 22.  It is expressly understood and agreed that time shall be considered the essence of this Sub-Contract on the part of the Sub-Contractor.  The Sub-Contractor expressly agrees to perform all work herein described and the several parts thereof, continuously, energetically and expeditiously, in full accord with the requirements of the General Contract as determined by the Contractor and at such times and in such order as the Contractor considers necessary to keep the same sufficiently in advance of other parts of the building and/or project, and to avoid delay in the completion of the construction as a whole.  The Sub-Contractor agrees to make any claims for extension of time or for damages for delays or otherwise to the Contractor in the same manner as provided in the General Contract for like claims with the Contractor upon the Owner, and in such time to enable the Contractor to present such claims to the Owner for payment or recognition; and the Contractor will not be liable to Sub-Contractor on any claim not timely or properly presented, or until allowed by the Owner.  The Sub-Contractor agrees to reimburse the Contractor of any loss, damage or expense, including, but not restricted to, any penalty or liability for damages incurred by Contractor to Owner which is due to Sub-Contractor's failure to deliver any and all material as required, or to perform properly any and all work in keeping with the progress of the general construction work, or to perform properly any term, covenant or condition contained in this Sub-Contract, or which is due to any breach of any of the provisions of this Sub-Contract, or which is due to delays in performance of the General Contract caused by Sub-Contractor; and it is further agreed that if the Sub-Contractor fails to prosecute any part of the work to be done under this Sub-Contract diligently, or if he fails to make such progress required by the Contractor in order to keep sufficiently ahead of the Contractor's other operations, or if the Sub-Contractor shall abandon said work or any part thereof, or fails in any way to perform the conditions of this Sub-Contract on his part to be performed, or shall become insolvent or make an assignment for the benefit of creditors, or commit an act of bankruptcy or have a petition in bankruptcy filed by or against him, or shall die or otherwise be physically or mentally disable, the Contractor shall have the right if it so elects, and without prejudice to any other right it may have, immediately and without notice to terminate this Sub-Contract and/or take any steps it deems advisable to secure necessary labor and material, by contract or otherwise, and may take over all of said Sub-Contractor's equipment, tools and supplies which my be either at the site of the work or enroute to the site where the work is being performed, and may prosecute the work to completion.

In case Contractor deems this procedure necessary for the proper conduct of the work, all monies expended therefore, including, but not restricted to, the cost of materials, labor, subcontracts, transportation, equipment expense and rentals thereon, supplies, services, insurance, taxes, appliances, tools, teams, utilities, power used or consumed, supervision, administration, job overhead, travel, legal and accounting fees and expenses, Contractor's general overhead as allocated to the work and other costs and expenses incurred or sustained by the Contractor, plus ten per cent (10%) of the cost of the work performed as set forth above, as well as the amount of claims against Sub-Contractor paid by Contractor or for which it deems itself liable, shall be deducted from the Contract Price stated herein, and if such total sum exceeds the amount otherwise due the Sub-Contractor hereunder, Sub-Contractor agrees to pay the Contractor the full amount of such excess together with interest thereon at the rate of six per cent (6%) per annum until paid; or in case of any default on the part of Sub-Contractor, the Contractor may exercise any other right or remedy available to it.

Section 23.  Sub-Contractor unconditionally warrants and guarantees all labor and/or material and/or services employed and furnished by or to it in performing the work and agrees promptly to amend and make good, upon demand by the Contractor or Owner, and at Sub-Contractor's expense, any and all defects due to imperfect workmanship and/or materials and/or damages resulting there from, to the entire approval and acceptance of the Contractor and Owner and/or architect or their authorized representatives.  Should the Sub-Contractor refuse or neglect to proceed at once with the correction of rejected or defective materials and/or workmanship, after receiving notice to do so, then the Contractor shall have the defects remedied or changes made at the expense of Sub-Contractor, and the Sub-Contractor agrees to pay Contractor on demand any and all loss and/or expense paid or incurred by Contractor in remedying such defects, and/or making such changes, plus ten per cent (10%) of such amounts to cover supervision, insurance, overhead, etc., together with interest on said sum at the rate of six per cent (6%) per annum until paid.  Furthermore, Sub-Contractor agrees to perform Contractor's guarantees and undertakings in the General Contract insofar as same pertain to the work covered by this Sub-Contract and to protect Contractor from any liability thereon.  The obligations set forth in this paragraph are continuing and shall survive completion of the construction project an acceptance of work, and making final payment to Sub-Contractor shall not relieve Sub-Contractor of its obligations and liabilities hereunder.

Section 24.  The obligation of the Sub-Contractor to perform and complete all work covered by this Sub-Contract to the satisfaction of Contractor and Owner is absolute and without exception.  Sub-Contractor shall effectively secure and protect its material and work and shall bear and be liable for all loss and/or damage of any kind in connection therewith at any time prior to final completion and acceptance thereof by Owner, unless said loss or damage is solely caused by direct negligence of the Contractor.  Sub-Contractor shall reimburse Contractor on demand for any breakage, or other damage to other work or materials occasioned by the Sub-Contractor n the execution of this Sub-Contract.

Section 25.  If the Sub-Contractor deems that surfaces or work to which his work is to be applied or affixed are unsatisfactory or unsuitable, written notification of said condition shall be given to the Contractor before proceeding or taking remedial action; otherwise no consideration will be given to claims for extra compensation or non-responsibility in connection therewith.

Section 26.  The Sub-Contractor shall provide at its own expense whatever hoisting facilities, utilities, services, storage sheds, work shops and offices that are necessary for the performance of this Sub-Contract, and shall remove and thoroughly clean the premises at the completion of the work.  If the Sub-Contractor has occasion to utilize any of the facilities of the General Contractor, if available, it shall pay a proportion of the cost thereof.

Section 27.  The Sub-Contractor shall clean up and remove from the site as directed by the Contractor all rubbish and debris resulting from its work; also, it shall clean up to the satisfaction of Owner and Contractor, all dirt, grease, marks, etc., from walls, ceilings, floors, fixtures, etc., deposited or placed thereon as a result of the execution of this Sub-Contract.  If the Sub-Contractor refuses or fails to perform this cleaning as directed by the Contractor, the Contractor shall have the right and power to proceed with said cleaning, and the Sub-Contractor will on demand repay to the Contractor the actual cost of said work plus ten per cent (10%) of such cost to cover supervision, insurance, overhead, etc., together with interest on said total sum at the rate of six per cent (6%) per annum until paid.

Section 28.  Contractor may but is not obligated to carry Builders' Risk Insurance on this construction project.  Should Contractor carry this insurance, then Sub-Contractor shall have an interest therein as determined by Contractor to the extent same covers work of the Sub-Contract.  Sub-Contractor agrees it will assume the responsibility to determine whether this insurance is in force.  In the even the Contractor should elect to carry Builders' Risk Insurance, the Sub-Contractor agrees to submit immediately, for the purpose of determining values under the insurance coverage, a complete breakdown of this contract price showing materials, labor, expendable tools, supplies or any other thing or article of value, the cost of which is included in the contract price stated in this agreement.

Section 29.  The Sub-Contractor shall furnish promptly all samples, lists, drawings, cuts, schedules, etc., required in connection with its work, but approval of same does not relieve it of its responsibility of complying with the requirements of the drawings and specifications.  All transportation costs on samples and drawings furnished by the Sub-Contractor shall be paid by it.

Section 30.  The Sub-Contractor shall furnish all guarantees, bonds, operating instructions, etc., as required by the specifications and/or General Contract, and shall, if requested by the Contractor, furnish to the Contractor adequate performance and payment bonds in form and amounts and with surety acceptable to the Contractor.

Section 31.  If at any time any controversy shall arise between the Contractor and Sub-Contractor with respect to any matter or thing involved in this Sub-Contract, and which the parties hereto do not promptly adjust and determine or which the Owner or his authorized representative cannot decide to the satisfaction of both parties hereto, then the written orders of the Contractor shall be followed and upon the completion of the work and before the final settlement and payment is made, said controversy shall, if mutually

**Sub-Contract Agreement No. 082818-KAFB-REP**
**Page 5**

Sub-Contractor Initials ___

Contractor Initials ___



agreeable to Contractor and Sub-Contractor, be decided by arbitration; otherwise said controversy shall be decided by Court action in which action the prevailing party shall be entitled to have included in the judgment and award of reasonable attorney's fees incurred in connection with said action.

Section 32.  In case of any dispute between the Sub-Contractor and Contractor, Sub-Contractor agrees to be bound to Contractor to the same extent that Contractor is bound to Owner by the terms of the General Contract and by any and all decisions or determinations made there under by the party or board so authorized in the General Contract. Sub-Contractor also agrees to be bound to Contractor to the same extent the Contractor is bound to Owner by the final decision of a court of competent jurisdiction, whether or not Sub-Contractor is a part to such proceeding.  If such dispute is prosecuted or defended by Contractor against Owner under the terms of the General Contract or in court action, Sub-Contractor agrees to furnish all documents, statements, witnesses and other information required by Contractor for such purpose and to pay or reimburse Contractor for all expenses and costs, if any, incurred in connection therewith. It is expressly understood that as to any and all work done and agreed to be done by the Sub-Contractor and as to any and all materials or services furnished or agreed to be furnished by Sub-Contractor, and as to any and all damages, if any, incurred by Sub-Contractor, in connection with this construction project, Contractor shall never be liable to Sub-Contractor to any greater extent than Owner is liable to Contractor.  No dispute shall interfere with the progress of construction and Sub-Contractor shall proceed with its work as directed.

Section 33.  The Sub-Contractor shall hold and save the Contractor harmless from any liability including costs, expenses, and reasonable attorney's fees, for or on account of any patented or unpatented invention, article or appliance manufactured or used in the performance of this Sub-Contract, including their use by the Owner.

Section 34.  The Sub-Contractor shall not place on the work any equipment of which he is not sole owner unless he obtains written permission from the Contractor, nor shall the Sub-Contractor employ any workmen in the performance of this Sub-Contract whose employment might be reasonably objected to by the Contractor, the Owner or the architect and/or engineer.

Section 35.  Non-discrimination in employment – (a) The Sub-Contractor, in performing the work required by this contract, shall not discriminate against any employees or applicants for employment because of race, creed, color, or national origin. (b) The Sub-Contractor agrees that the provision of paragraph (a) above will also be inserted in all of its sub-contracts.  For the purpose of this article, a "sub-contract" is defined as any contract entered into by the Sub-Contractor with any individual, partnership, association, corporation, estate or trust, or any business enterprise or other legal entity, for a specific part of the work to be performed in connection with the supplies or services furnished under this contract; provided, however, that a contract for the furnishing of standard or commercial articles or raw materials shall not be considered as a sub-contract.

Section 36.  The Sub-Contractor shall give its personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the Contractor, on the work being performed at all times, with authority to act for it.

Section 37.  In the event Contractor employs attorney or incurs other expense it may deem necessary to protect or enforce its rights under this Sub-Contract or in connection with any work done or agreed to be done by Sub-Contractor on this construction project, Sub-Contractor and the surety, if any, on its bond, jointly and severally agree to pay the attorneys' fees and expenses so incurred by the Contractor.  In addition, wherever in this Sub-Contract Sub-Contractor agrees to pay expenses incurred by Contractor, such expenses shall include, but are limited to, attorneys' fees and court costs incurred by Contractor.

Section 38.  The Sub-Contractor agrees to pay and to protect and indemnify the Contractor against liability for any damages sustained by another sub-contractor, materialman or other parties supplying labor, materials and/or services in the performance of the work covered by the General Contract which result from this Sub-Contractor's acts or omissions, whether or not negligent, failure to perform, delays in performance or default in the performance of the work to be done under this Sub-Contract.

Section 39.  Contractor shall not be liable to this Sub-Contractor, its materialmen, laborers or sub-contractors for any damages, loss or expenses sustained by any of them resulting from acts or omissions, whether or not negligent, failure to perform, delays in performance or defaults of another sub-contractor, materialman, or supplier of service in connection with the performance of any of the work covered by the General Contract.

Section 40.  Although drawn by Contractor, this agreement shall in the event of any dispute over its meaning or application, be interpreted fairly and reasonably and neither more strongly for nor against either party.

Section 41.  Waiver of any breach hereof shall not constitute a waiver of any subsequent breach of the same or any other provision hereof.

Section 42.  The Subcontractor will keep in strictest confidence, both during the term of this subcontract agreement and subsequent to termination of this subcontract agreement, and will not during the term of this subcontract agreement or thereafter for two years disclose or divulge to any person, firm or corporation, or use directly or indirectly, for his own benefit or others, any information which in good faith and good conscience ought to be treated as confidential business information including, but without limitations to, information as to sources of, and arrangements for, demolition work or opportunities provided to or from customers or clients of the Contractor, customer or contact lists and any other confidential business information or trade secrets respecting the business or affairs of the Contractor which the Subcontractor may acquire or develop in connection with or as a result of his services hereunder.  The subcontractor acknowledges that disclosure of any confidential business information by the subcontractor will give rise to irreparable injury to the Contractor or the owner of such information. Accordingly, the Contractor or such other party may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings, in addition to any other legal remedies, which may be available.  The Subcontractor shall have no proprietary interest in the work services developed by subcontractor during the course of engagement and expressly assigns all rights to copyrights, patents, trade secrets or other proprietary rights to the Contractor.

**Having read and fully understanding this agreement, the Contractor and the Sub-Contractor for themselves, their successors, executors, administrators and assigns, hereby agree to the full performance of the covenants of this agreement.**

IN WITNESS WHEREOF, they have executed this agreement the day and date first written above.

WITNESS:

_____

_____

Sub-Contract Agreement No. 082818-KAFB-REP
Page 6

Euro Painting, Inc.
Sub-Contractor

By _____

MIRADOR Enterprises, Inc.
Contractor

By _____

Sub-Contractor Initials _____

Contractor Initials _____